**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 6, 2020
Decided February 9, 2021

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-2165

DJILLALI AHMED,
    *Petitioner*,

    *v.*

MONTY WILKINSON,[*] Acting Attorney
General of the United States,
    *Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.

No. A 077-820-051

**ORDER**

    This petition for review concerns the denial of Djillali Ahmed's second motion to reopen his (very protracted) immigration proceedings. An Algerian who fled the

---

    [*] We have substituted Monty Wilkinson, the acting Attorney General, for the respondent. FED. R. APP. P. 43(c).

country in 1999 after serving in its military and state police forces, Ahmed argues that his removal proceedings must be reopened because of changed circumstances there—namely, an escalating conflict between Algeria's security forces and Islamic militants, and a death threat targeting him that was sent to his family's home.[1] But because Ahmed failed to supply evidence demonstrating his prima facie eligibility for asylum, we must deny his petition.

## I

Ahmed, now 49 years old, testified that he came to this country out of concern that terrorist organizations in Algeria had targeted him for harm because of his role in the anti-terrorist operations of the Algerian government's security forces. He served in the Algerian army in the early 1990s; during that stint he spent 10 months guarding a jail that housed captured Islamic terrorists. In 1994, he joined the Algerian state police force and was assigned to airport security, a dangerous job that included scanning for bombs and contraband. At that time, Ahmed testified, police officers were being killed daily by Islamic militants. Ahmed resigned in 1996 after Islamic militants ambushed a group of fellow officers. On one occasion, someone shot at Ahmed while he was visiting his sick father. In early 1999, he smuggled himself into this country by hiding aboard a petroleum ship bound for Boston.

Ahmed soon was placed in removal proceedings. He conceded removability but applied for asylum based on his membership in a particular social group—Algeria's police and security forces. An immigration judge denied his application, concluding that he could not show past persecution or a well-founded fear of future persecution, since he had not pointed to anything distinct from the occupational hazards that went along with his prior security jobs.

Ahmed then appealed to the Board of Immigration Appeals. While that appeal was pending, he moved to remand his proceedings so that he could adjust his status to reflect his selection in the 2001 Diversity Immigration Visa Program.

The Board denied that motion, because Ahmed did not meet the statutory requirements for adjustment of status under 8 U.S.C. § 1255(i). In the same order, the Board upheld the denial of his application for immigration relief. The Board agreed with the immigration judge that the dangers faced by police officers stemmed from the nature of the job and Algeria's volatile political situation rather than from any

---

[1] We furnished a comprehensive description of the underlying facts and Algeria's tumultuous political situation in our 2003 published opinion in Ahmed's case. *Ahmed v. Ashcroft*, 348 F.3d 611 (7th Cir. 2003).

statutorily protected ground (including Ahmed's proposed membership in a particular social group). The Board also found that Ahmed had not developed any argument based on fear of future harm, given that he did not experience persecution in the two years he spent in Algeria after leaving the police force, and he had not shown that the Algerian government was unable to protect its officers from persecution by private actors.

Ahmed then petitioned for review, but we denied relief. See *Ahmed v. Ashcroft*, 348 F.3d 611 (7th Cir. 2003). We concluded that Ahmed, who had evaded harm by moving from place to place in the desert, failed to demonstrate past persecution because none of the events he described involved harm or threats of harm to him. *Id*. at 616. As for his fear of future persecution, we ruled that he failed to meet the demanding standard of presenting specific, detailed facts showing that he had a good reason to fear being singled out for persecution. *Id*. at 618.

In the meantime, Ahmed had filed his first motion to reopen his proceedings based on changed country conditions. He argued that widespread violence in Algeria had escalated in the aftermath of a presidential amnesty decree that failed to resolve the conflict between the Algerian government and the Islamic fundamentalists. The Board denied the motion, concluding that an increase in generalized violence did not "necessarily translate into the specific targeting of former police officers."

Fast forward fifteen years: In 2018, Ahmed filed a second motion to reopen the proceedings, alleging changed circumstances in Algeria based on new evidence. That new evidence included a letter from Ahmed's brother noting the death of two of his colleagues (without a reference date), enclosing recent news articles about the continuing conflict between Algerian security forces and Islamic militants, and forwarding a 2018 letter purportedly sent by the "Sharia Branch of the Islamic Group of Jihad" to his family's home in Algeria, threatening him with death.[2] According to

---

[2] The letter warned him that the group had not forgotten him and that he would be killed if he returned to Algeria:

> To Ahmed Djilali, the unjust police officer/We are the Islamic group of Jihad/We let you know that you are followed by our group and according to our recent information you are fleeing outside the country/Do not think we have forgotten you/We will not leave you feeling safely/If you are arrested, your blood is legitimate and death awaits you/Since you were the reasons to put some members of our group in prison/If you fell into our hands, you would not enjoy even one hour in your life/I know that our swords reach you for long or short/Do

Ahmed, this evidence demonstrated that no amount of vigilance or government protection would stop the Islamic militants from killing him.

The Board denied the motion on May 20, 2019. It concluded that the news articles did not reflect materially changed country conditions in Algeria but instead depicted only an "ongoing" conflict between the country's security forces and terrorist groups. Ahmed's motion, the Board added, failed to include evidence demonstrating that the government was unable or unwilling to protect him. Lastly, the Board determined that Ahmed failed to demonstrate prima facie eligibility for asylum, as required by 8 C.F.R. § 1003.2(c)(3)(ii), and therefore did not demonstrate that the new evidence would likely change the result in this case. Ahmed filed a timely petition for review of the May 20 decision on June 18, 2019.

In February 2020, Ahmed filed a third motion to reopen, in which he tried to cure some of the deficiencies of his second motion by including a letter from an Algerian government official stating that the government will not be able to protect him from terrorists. The Board promptly denied this motion because, among other reasons, the additional statements did not establish that the conflicts between police and terrorists had worsened. Ahmed did not petition for review from this decision.

## II

At the outset, we must clarify which of the Board's several decisions is the subject of this petition for review. Ahmed asserts in his Statement of Jurisdiction that he seeks review of the Board's *February 2020* order denying his third motion to reopen but writes in his Statement of the Case that he seeks review of the Board's *May 2019* order. The government correctly notes, however, that the 2020 order (along with the related materials) is not properly before us, because Ahmed did not petition for review from that order. The timely filing of a petition for review is a jurisdictional requirement, see *Stone v. INS*, 514 U.S. 386, 405 (1995), and Ahmed therefore needed to file separate petitions for review of each of the Board's final orders that he wished to challenge. *Youkhana v. Gonzales*, 460 F.3d 927, 933–34 (7th Cir. 2006); see also *Lavery v. Barr*, 943 F.3d 272, 275 (5th Cir. 2019) (a "separate final order requir[es] its own petition for review"). He did not, with respect to the February 2020 order, and so we have no more to say about it.

Ahmed's petition nonetheless can be read to challenge the Board's denial of his second motion to reopen. This court reviews the Board's denial of a motion to reopen

not think we forgot you/Neither the soldiers of the tyrants nor their police will protect you.

for abuse of discretion. *Meriyu v. Barr*, 950 F.3d 503, 507 (7th Cir. 2020). His argument essentially is that the Board erred by failing to consider whether the 2018 death threat, which his family received at his address in Algeria, could establish materially changed circumstances. According to Ahmed, the fact that the Islamic Group of Jihad issued a death threat toward him showed that there is an "outward menacing threat by terrorist groups" that was "not commonplace" two decades earlier.

The Board's order, thin as it is, does not evaluate the significance of the letter containing the death threat. The order mentions the existence of the communication—quoting phrases from the letter that Ahmed had been "fleeing outside of the country" and that "death awaits" him—but stops there. The Board should have said more, since a change in circumstances, as the government acknowledges, can include a change in personal circumstances. *Yahya v. Sessions*, 889 F.3d 392, 395 (7th Cir. 2018) (change in circumstances "need not reach the level of a broad social or political change in a country; a personal or local change might suffice"). That change must "aris[e] in the country of nationality." 8 C.F.R. § 1003.2(c)(3)(ii). *Joseph v. Holder*, 579 F.3d 827, 833 (7th Cir. 2009). Although the government seeks to discount the significance of the threat by asserting that it merely confirms the ongoing nature of the conflict between the government's security forces and terrorists, that assertion runs afoul of the *Chenery* doctrine because it was not a ground on which the Board relied for its decision. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). And in any event, the government's position makes too little of Ahmed's argument that the threat reflects personal circumstances far more targeted and dangerous than he faced when he left Algeria in 1999.

Changed circumstances, however, is just one of the factors that the Board considers when adjudicating a request for reopening. 8 C.F.R. § 1003.2(c)(3)(ii). The Board also must assess whether the evidence establishes a prima facie claim for the relief sought. *Melnik v. Sessions*, 891 F.3d 278, 288 (7th Cir. 2018). And because persecution does not encompass purely private action, a petitioner in Ahmed's shoes also must show that the government was either unable or unwilling to protect him. *Bitsin v. Holder*, 719 F.3d 619, 630 (7th Cir. 2013).

Ahmed baldly asserts that the government is powerless to protect him and compares his situation to that of the petitioner fleeing political persecution in *Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005). In *Hor*, we overturned the denial of asylum because of "strong evidence that the government … is indeed incapable of protecting" the applicant. Hor, an active member of the ruling FLN political party who was detained and threatened at a roadblock by members of a radical military wing fighting the Algerian government, was saved only by the immediate arrival of the police. *Id.* at 499. We found it "decisive" that the military itself was unable to protect Hor, a military

veteran, and that all the Algerian court could provide in the way of protection was advice to maintain a low profile. *Id.* at 502.

Ahmed's case does not present such compelling evidence. Unlike Hor, who presented ample evidence that the military could not protect him—the roadblock experience, reinforced by State Department reports from 2003–05—Ahmed has not introduced either direct or circumstantial evidence that the Algerian government is unable or unwilling to protect him. Further, recent State Department reports, of which we may take judicial notice, *Meriyu*, 950 F.3d at 508, do not tip the balance either way. The 2017 and 2018 Human Rights Reports both describe violence in broad strokes: "Some terrorist groups remained active … [and] targeted security services personnel in periodic but small-scale attacks." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Algeria: Human Rights Report 2018, 2. See also U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Algeria: Human Rights Report 2017, 2. The 2019 report, however, makes no mention of this violence. It is thus unclear whether it has subsided and, if not, whether the government would be unable to protect Ahmed. U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Algeria: Human Rights Report 2019.

Further, as the government notes, the record contains evidence—albeit somewhat vague—that the Algerian government has taken steps to provide police officers like Ahmed with secure compounds to protect them from terrorist attacks. The immigration judge mentioned a shuttle bus and a housing facility for police officers, and Ahmed testified that "after the violence began in Algeria in 1992, the government began to [establish] special residences for security." That may not be much, but it was Ahmed's burden to show the requisite inability of the state to protect him. The Board did not abuse its discretion when it denied Ahmed's second motion to reopen.

We DENY the petition for review.